IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

ANITA L. ADKINS,

      Plaintiff,

v.                          CASE NO. 2:08-cv-00324

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the court on briefs in support of judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Anita L. Adkins (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on June 2, 2004, alleging disability as of June 1, 2003, due to depression, back pain, fibromyalgia, degenerative arthritis in back, neck, shoulder, foot pain, and bi-polar disorder. (Tr. at 17, 69-73, 84-91, 108-12, 137-43, 144-51, 154-59, 392-95.) The claims were denied

initially and upon reconsideration.  (Tr. at 17, 397-399, 403-05.)
On December 4, 2005, Claimant requested a hearing before an
Administrative Law Judge ("ALJ").  (Tr. at 38.)  The hearing was
held on March 28, 2006 before the Honorable Arthur L. Conover.
(Tr. at 52, 438-67.)  By decision dated April 14, 2006, the ALJ
determined that Claimant was not entitled to benefits.  (Tr. at 17-
23.)  The ALJ's decision became the final decision of the
Commissioner on March 20, 2008, when the Appeals Council denied
Claimant's request for review.  (Tr. at 5-8.)  On May 19, 2008,
Claimant brought the present action seeking judicial review of the
administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a
claimant for disability benefits has the burden of proving a
disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir.
1972).  A disability is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable impairment which can be expected to last for a
continuous period of not less than 12 months . . . ."  42 U.S.C. §
423(d)(1)(A).

The Social Security Regulations establish a "sequential
evaluation" for the adjudication of disability claims.  20 C.F.R.
§§ 404.1520, 416.920 (2002).  If an individual is found "not
disabled" at any step, further inquiry is unnecessary.  Id. §§
404.1520(a), 416.920(a).  The first inquiry under the sequence is

2

whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574

3

(4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 19.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of fibromyalgia, osteoarthritis of the neck and back, plantar fasciitis, and affective disorder.  (Tr. at 19-20.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 20.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 21-22.)  As a result, Claimant cannot return to her past relevant work.  (Tr. at 22.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as surveillance system monitor, hand packer, and product inspector which exist in significant numbers in the national economy.  (Tr. at 22-23.)  On this basis, benefits were denied. (Tr. at 23.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular

4

> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to scrutinize the record as a whole to determine whether the

conclusions reached are rational." Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was forty-nine years old at the time of the

administrative hearing; her birth date is in September, 1956. (Tr.

at 69, 443.) She has a high school education and two years of

college education. (Tr. at 444, 90.) In the past, she worked as

a laboratory technician and mail processor. (Tr. at 445-48.)

The Medical Record

The court has reviewed all evidence of record, including the

medical evidence of record, and will summarize it briefly below.

Physical Evidence

On March 13, 1998, Thomas W. Howard, M.D., a rheumatologist, wrote a letter to M. Bryan Reynolds, D.O. thanking him for referring Claimant to him for examination.  He found:

> On exam, she had widespread tender points compatible with fibromyalgia.  Her muscle strength is normal in all four extremities.  She does have mild degenerative changes in the hands but I was unable to identify any particular problem explaining her right second finger pain. Reflexes, gait, and straight leg raising test were all negative.  I am not sure why she has an elevated serum CK level but I do not feel that she has polymyositis or any inflammatory rheumatic problem at this time... Treating for fibromyalgia will help her to feel better and she will begin Elavil 10 mg. q. 9 p.m. for improved sleep. She will use over-the-counter analgesics for pain control.  I suspect that she is just one of many in the population that have a higher than average CK level as a baseline.  She will follow up with you for ongoing care.

(Tr. at 391.)

On July 14, 2003, Claimant was admitted to Charleston Area Medical Center ("CAMC") emergency room ("ER") following a motor vehicle accident.  (Tr. at 187-217.)  Todd A. Witsberger, M.D., reported: "Surgery Service was consulted after the entire workup was negative, aside from severe alcohol intoxication... The patient was without apparent injury after her motor vehicle collision." (Tr. at 191.)  The injury was determined to be a suicide attempt: "[s]he had been drinking...and gone to the bridge to jump and then left the bridge and was apparently driving back and this motor vehicle accident [occurred] for which she was admitted."  (Tr. at 195.)

6

Medical records show Claimant was treated at Modern Medicine Clinic from December 23, 2003 to September 1, 2005.  The notes are handwritten and largely illegible. (Tr. at 275-96, 376-78, 380-84.)

On May 21, 2004, Claimant had an x-ray of her lumbar spine at Thomas Memorial Hospital.   David Abramowitz, M.D. made this radiological finding: "No acute bony pathology.  Mild degenerative changes most prominent at the L5-S1 disc space level."  (Tr. at 270.)

On September 14, 2004, Dr. Lim signed a form entitled "Routine Abstract Form - Physical" for the State of West Virginia ("W. Va.") Disability Determination Section. (Tr. at 227-30.) The handwritten parts of the form are illegible.  All of the checked parts in the signs/symptoms section indicate "normal" with the exception that two parts stating "chest pain" and "evidence of congestive heart failure" which are checked "unknown." (Tr. at 228-29.)  Illegible handwritten office notes are attached dated from July 16, 2001 to August 24, 2004.  (Tr. at 221-38.)

On September 29, 2004, Dr. Lim received reports from Frank A. Muto, M.D. of the Medical Imagining Department of CAMC.  The first indicated that Claimant's cervical spine image showed: "Minimal disc space narrowing at C5/6 and C6/7 compatible with spondylosis. No acute osseous findings."  (Tr. at 239.)  The second report of Claimant's chest 2 view (PA and lateral) showed: "No evidence of acute intrathoracic disease."  (Tr. at 240.) A third report from

7

Edward Grey, M.D., Cardiopulmonary Department, reported: "Normal PFT." (Tr. at 241-42.) A fourth report indicated Claimant's cholesterol was normal. (Tr. at 243.)

On October 18, 2004, Claimant had an x-ray of her cervical spine at Thomas Memorial Hospital. David Abramowitz, M.D. made this radiological finding: "No acute displaced fracture or dislocation. Disc spaces are well maintained. There appears to be a small posterior osteophtye at C5-6 and narrowing of the intervertebral... Prevertebral soft tissues are within normal limits. No other significant findings noted." (Tr. at 388.)

On October 31, 2004, Claimant underwent a cervical spine MRI. Marvin R. Abdalah, M.D., radiologist, concluded Claimant had "mild to moderate disc degenerative changes at C5-6 and C6-7... No evidence of focal disc protrusion or central canal stenosis." (Tr. at 386-87.)

On November 4, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform work without limitation. (Tr. at 260-68.) The evaluator, A. Rafael Gomez, M.D. noted:

> Patient is not entirely credible. Her allegations and restrictions are not supported by the medical findings. Has chronic neck pain and the only objective finding is narrowing of C5-6, C6-7 spaces by x-rays. The physical and neurological exams are normal. She does not have any exertional limitations.
> NON SEVERE PHYSICAL IMPAIRMENT.

(Tr. at 265.)

On December 6, 2004, Claimant had an x-ray of her right shoulder at Thomas Memorial Hospital. Riad Alasbahi, M.D. made this radiological finding: "minimal osteoarthritis... No fracture or dislocation and no lytic or blastic lesions are identified. No soft tissue calcification is seen. (Tr. at 269.)

On May 24, 2005, Claimant had x-rays of her right foot and left foot at Thomas Memorial Hospital. Dr. Alasbahi made this radiological finding: "minimal osteoarthritis of the first metatarsophalangeal joint... No fracture or dislocation and no soft tissue abnormality is seen. (Tr. at 379.)

On June 27, 2005, Raymond A. Lim, M.D. provided a form entitled "Medical Consultants Case Analysis." The handwritten page is largely illegible but may state "insufficient to properly assess severity." (Tr. at 337.)

On July 13, 2005, Stephen Nutter, M.D. provided an internal medicine examination of Claimant for the W. Va. Disability Determination Division. (Tr. at 339-344.) Dr. Nutter examined the Claimant and concluded:

> **IMPRESSION:**
> 1.   Osteoarthritis.
> 2.   Chronic Cervical and Lumbar Strain. There is no evidence of radiculopathy.
>
> **SUMMARY**: The claimant reports problems with her back and neck. There are range of motion abnormalities of the cervical and lumbar spine... Straight leg raise test is negative. There are no sensory abnormalities. Reflexes are normal. Muscle strength testing is normal. These findings are not consistent with nerve root compression.

9

> The claimant reports problems with joint pain... there is joint pain and tenderness. There is no synovial thickening, periarticular swelling, nodules or contractures consistent with rheumatoid arthritis.

(Tr. at 342.)

On July 13, 2005, Claimant had x-rays of the lumbar spine (2 views). Eli Rubenstein, M.D. reviewed the x-rays and reported: "There is a slight narrowing of L-5, S-1. The rest of the interspaces are normal. There is no scoliosis. There is no pedicle defect. There is no compression fracture. The sacro iliac joints are normal." (Tr. at 343.)

On July 28, 2005, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the postural limitations that she could never climb ladder/rope/scaffolds and occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl. Claimant had no manipulative, visual or communicative limitations. Claimant was found not to have environmental limitations with the exceptions being to avoid extreme temperatures and moderate exposure to vibration or hazards. (Tr. at 345-53.) The evaluator, Marcel Lambrechts, M.D. noted:

> After reviewing Dr. Nutter's physical report, I still believe this claimant's symptoms are from fibromyalgia. She may have arthritis as described but it certainly is not quite as severe as she claims. The reports of xrays in file are not impressive but her symptoms are. She has pain in back, right shoulder and neck. Her diagnosis of fibromyalgia was made several years ago and it has not improved much. She claims to be worse now. She appears to be depressed too. Whatever her diagnosis is, I have

10

reduced her RFC as noted.

(Tr. at 350.)

Medical records from Associated Foot and Ankle Clinic dated September 29, 2005 to December 21, 2005 show that Claimant was treated for bilateral heel pain. (Tr. at 254-67.) Mohammad Imani, D.P.M., A.B.P.S., A.B.P.O., stated in his December 21, 2005 report that the "[s]everity of condition is 2 on a scale of 0-10 with 10 being the worst." (Tr. at 354.) He diagnosed plantar fasciitis, calcaneal bursitis, bilateral; hallux valgus; tendonitis: peroneal, right; and onychomycosis. He advised Claimant "to continue with rest, ice and stretching exercise, Lamisil and Voltaren...I explained to the patient the etiology and treatment options for heel pain. I discussed conservative care options that usually decreases symptoms 80-90% in 6 months." (Tr. at 355.)

On May 5, 2006, Heather D. Curry, MSN [Master of Science in Nursing], of the West Virginia Health Right provided a one-page form stating:

> Medications: Neurontin, Seroquel, Lamictal, Allegra.
> S: Pt [patient] presents for MRI/lab results. No voiced complaints x [except] ongoing numbness of R [right] hand/arm...
> A/P: Osteoarthritis, cervical radiculopathy, hematuria

(Tr. at 406.)

On May 8, 2006, Claimant underwent a cervical spine MRI at CAMC. Johnsey L. Leef, Jr., M.D. reviewed the MRI and reported:

> HISTORY: Numb sensation in right hand first and second digits. Numbness in right foot. Pain in right arm,

11

onset 2 months ago.   Sagittal and axial images were
obtained.   There is a hemangioma of the 7th cervical
vertebra.   Central spondylosis of 4-5, 5-6, and 6-7.
There is a spur at 5-6 right that encroaches on the
neural foramina.

IMPRESSION: Cervical spondylosis at multiple levels.
There is a spur at C5-6 on the right which encroaches on
the neural foramina which could be the cause of the
patient's symptoms.

(Tr. at 407.)

<u>Psychiatric Evidence</u>

On February 5, 2002, Mely Lim, M.D. wrote a handwritten note

on a prescription form stating:

Dear Sir/Madam: Ms. Adkins came back for followup today.
She recalled that since she quit her job, the primary
experienced symptoms of dysthymia have resolved.  She had
most likely suffered from a stress related peptic ulcer
(acid peptic) disease from her work.  If there is other
question please don't hesitate to reach me.

(Tr. at 390.)

A form report dated February 4, 2003, shows Dr. Lim provided

Claimant with a sample of Zoloft and noted: "Adjustment DO

[disorder] of mixed [illegible]."  (Tr. at 389.)

On July 15, 2003, Claimant was admitted to CAMC's Behavioral

Medicine Unit for "identified suicidal ideation."  (Tr. at 220.)

Peter Edelman, M.D. discharged Claimant on July 21, 2003 after she

agreed to outpatient treatment and medical management.   His

discharge diagnoses:

AXIS I:  Major depressive disorder, recurrent, severe,
    without psychotic features
AXIS II:  Dependent trait.
AXIS III: Fibromyalgia and irritable bowel syndrome.

12

> AXIS IV: Unemployment, financial stressors, limited
>    social support.
> AXIS V: 40-50.

(Tr. at 220-21.)

Medical records show Claimant was treated at Robert C. Byrd Health Sciences Center of West Virginia University - Charleston Division, Department of Behavior Medicine and Psychiatry, from July 30, 2003 to December 30, 2005. The notes are handwritten and largely illegible. Many of the forms are checked as "Medical Management." A few are checked as "Individual Therapy." One form is checked as "Telephone Consultation." (Tr. at 297-316.) One undated typed page near the end of the Department's records titled "Transfer Summary" signed by David Clark, M.D., Resident Psychiatrist, and Veena Bhanot, M.D., Associate Professor. The report states:

> DIAGNOSIS: MDD [major depressive disorder] recurrent,
> 296.32, rule out bipolar disorder.
>
> MEDICATION:
> 1) Lexapro 20 mg po each day
> 2) Neuronton 600 mg one tablet po tid
>
> BRIEF COURSE OF THERAPY: Anita was initially seen on the
> inpatient unit by myself and Lisa Hale following intake
> in July 2003 following a first ever considered suicide
> attempt. She was involved in a MVA [motor vehicle
> accident], driving home after deciding not to kill
> herself and was placed on the trauma unit. She responded
> well to CBT therapy and mood stabilization. She has been
> debating on how and when to return to work. Supportive
> therapy would be most helpful in the long run in her
> being able to return to work.

(Tr. at 374.)

13

Prescription records dated April, 26, 2004, May 20, 2004, and June 6, 2004 show Claimant was prescribed Lexapro 10 mg, Neurontin 600 mg, and Nabumetone 750 mg through the CAMC Department of Behavioral Medicine and Psychiatry. (Tr. at 226.)

On November 4, 2004, a State agency medical source completed a Psychiatric Review Technique form. (Tr. at 245-59.) The evaluator, Rosemary L. Smith, Ph.D., a licensed psychologist, found Claimant's impairment was not severe regarding her affective disorders and personality disorders. (Tr. at 245.) She found Claimant had the affective disorder of major depressive disorder and had the personality disorder of "dependent traits." (Tr. at 248, 252.) She stated that Claimant's degree of limitation was mild in the areas of restriction of activities of daily living and difficulties in maintaining social functioning, concentration, persistence or pace. She concluded that Claimant had no episodes of decompensation and that the evidence did not establish the presence of the "C" criteria. (Tr. at 255-56.) Dr. Smith noted:

> Records indicate claimant's mood has improved with treatment. Claimant has been alert and oriented with good eye contact. In the 8/12 OV, mood was "some anxiety" over thoughts of returning to work or volunteering. Affect was broad. SOT - goal directed.
>
> Claimant is not entirely credible re: problems of getting along with others and problems of concentration/memory. She reports visiting others and at the OV's, she is cooperative. MSE exams and her ADL's [activities of daily living] do not support significant problems with memory and concentration.
>
> Per "B" criteria, Impairments Not Severe.

14

(Tr. at 257.)

On June 19, 2005, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 317-336.)  The evaluator, Robert W. Solomon, Ed.D., a licensed psychologist, found Claimant's impairment was not severe regarding her affective disorders.  (Tr. at 317.)  He found Claimant had the affective disorder of major depressive disorder and that Claimant's degree of limitation was mild in the areas of difficulties in maintaining social functioning, concentration, persistence or pace.  (Tr. at 320, 327.)  He stated that Claimant had no restriction of activities of daily living, no episodes of decompensation, and that the evidence did not establish the presence of the "C" criteria.  (Tr. at 327-28.)  Dr. Solomon noted:

> ADLs [activities of daily living] - claimant reports being able to take care of her own personal needs, cook, clean, shop, exercise, attend doctor's appointments and take care of her own finances.
> OP Tx; "-affective D/O"; "bi-polar" NOT given as Dx [diagnosis]; MER reports some improvement. (Brief) MSE @ OP shows domains WNL [within normal limits].  ADL c/o psych[ological] decrements: "(I have) mood swings".  Claimant is partially credible b/c [because] she does have OP (only) Tx, W/affective Dx, meds, & ("improved") MER.  There is no MER, however, supportive of bi-polar Dx, & there is no indication her "mood swings" are out of WNL [within normal limits] range.  Non-severe.

(Tr. at 329.)

Progress notes from Robert C. Byrd Health Sciences Center of West Virginia University - Charleston Division, Department of Behavior Medicine and Psychiatry, dated May 26, 2005, July 28,

2005, September 22, 2005, October 13, 2005, and December 30, 2005 indicate that Claimant's diagnosis is "Bipolar Mood Disorder II." (Tr. at  368-75.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ's credibility determination did not comply with Social Security Ruling ("SSR") 96-7p; (2) the ALJ failed to consider Claimant's bipolar disorder when he assessed her residual functional capacity ("RFC"); and that Claimant provided new medical evidence since the hearing that establishes her disability.  (Pl.'s Br. at 7-14.)

The Commissioner argues that (1) the ALJ complied with the requirements of SSR 96-7p when he assessed Claimant's credibility; (2) the ALJ considered the impact of Claimant's bipolar disorder when he assessed her RFC; and (3) the Appeals Council considered the Claimant's new evidence but found that it did not provide a basis for changing the ALJ's decision.  (Def.'s Br. at 11-20.)

<u>Credibility Determination</u>

Claimant asserts that the ALJ's credibility determination did not comply with Social Security Ruling ("SSR") 96-7p. Specifically, Claimant asserts that

> the ALJ did not articulate in his decision the specific
> reasons for finding Ms. Adkins' not entirely credible.
> Just as in *Cannon*, the ALJ in this case made only a
> conclusory statement that he considered all the evidence
> of record, and that he found Ms. Adkins' testimony about
> her impairments not entirely credible.  The ALJ's

16

decision is absolutely void of any reasons explaining why he did not believe Ms. Adkins' testimony.

(Pl.'s Br. at 10.)

The Commissioner argues that the ALJ complied with the requirements of SSR 96-7p when he assessed Claimant's credibility. Specifically, the Commissioner asserts that

There is no merit to Plaintiff's blanket assertion that the ALJ did not sufficiently articulate the basis for this credibility determination... The ALJ cited specific reasons for his credibility determination, that were supported by the evidence in the record, and which were sufficiently specific to make clear why he determined Plaintiff was "not entirely credible." See SSR 96-7p, 61 Fed. Reg. at 34, 484.

(Def.'s Br. at 12.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In his decision, the ALJ states that he does not find Claimant to be entirely credible:

> After considering the evidence of record, <u>the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms</u>, but that <u>the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible</u>.

> Craig v. (sic) In <u>Craig v. Chater</u>, 76 F. 3d 585 (1996), the Fourth Circuit Court of Appeals...stated that the evaluation of pain and other symptoms is a two-step process. First, the claimant must show by objective medical evidence an impairment which could reasonably be expected to produce the pain (and other symptoms) alleged. <u>Id</u>. at 594. The Court characterized this as a threshold test, which the claimant must meet. <u>Id</u>. If the claimant meets this threshold test, then the adjudicator must proceed to consider the intensity and persistence of the pain (and other symptoms), and the extent to which the symptoms affect the claimant's ability to work, <u>Id</u>. at 595. Resolving doubts in the claimant's favor, the undersigned finds that the claimant has produced evidence of an impairment that could

reasonably be expected to cause the alleged symptoms. Therefore, the undersigned proceeds to the second part of the analysis.

When evaluating the intensity and persistence of pain (or other symptoms), the adjudicator must consider the following factors: activities of daily living; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of pain medications; treatment, other than medication, which the claimant has undergone for pain; any other measures the claimant uses to alleviate pain; and any other relevant factors (20 CFR 404.1529, 416.929).

As for the opinion evidence, the medical and psychological reviewers at the initial determination concluded that the claimant's impairments were not severe, as they did not impose more than minimal limitations on her ability to work. However, at reconsideration, Dr. Marcel Lambrechts, a state agency medical consultant, concluded that the claimant's fibromyalgia, neck and back pain, and arthralgia limit her to light exertion with additional postural and environmental limitations (Exhibit 13F).

(Tr. at 20-22.) [Emphasis in the original.]

The undersigned finds that the ALJ did not explain his reasons for finding Claimant not entirely credible. The ALJ merely underlined his conclusion and recited the standard of Craig v. Chater. His decision does not contain a thorough consideration of Claimant's daily activities, the location, duration, frequency, and intensity of Claimant's pain and other symptoms, precipitating and aggravating factors, Claimant's medication and side effects, and treatment other than medication. The undersigned finds that the ALJ did not properly weigh Claimant's subjective complaints of pain in keeping with the applicable regulations, case law, and social

security ruling ("SSR").  20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).

<u>Consideration of Bipolar Disorder / Residual Functional Capacity</u>

Claimant asserts that the ALJ committed reversible error when he failed to consider the effects of her bipolar disorder.  (Pl.'s Br. at 10-11.)  Specifically, Claimant argues that

> In the ALJ's decision, he did not discuss the disabling problems that Ms. Adkins experiences when she is suffering from her bi-polar disorder.  As discussed above, he merely stated that he found her testimony not entirely credible.  Because the ALJ failed to explain his reasons for disregarding the effect of Ms. Adkins' bi-polar disorder, his decision should be reversed. *Dobrowolsky; Cannon.*

(Pl.'s Br. at 11.)

The Commissioner asserts that the ALJ considered the impact of Claimant's bipolar disorder when he assessed her RFC.  Specifically, the Commissioner argues that

> The ALJ found that Plaintiff had an affective disorder that significantly impacted her ability to perform basic work activities (Tr. 19)... The Agency considers an affective disorder to be a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, such as a bipolar syndrome.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04 (2008).  It was evident that the ALJ considered Plaintiff's bipolar disorder when he assessed her RFC.  Overall, the ALJ determined that Plaintiff's affective disorder, along with her other impairments, restricted her mentally to simple, routine, repetitive work, where attention to detail was not required, and where minimal supervision and no waiting on the public as customers (either in person or by telephone) or piece-rate or quota work (Tr. 19, 21).  The record sustains the ALJ's determination that Plaintiff could mentally perform this type of work...

20

> The ALJ noted (Tr. 20) that Plaintiff's mood improved with treatment (Tr. 441, 455-56); this was reflected in her treatment notes (Tr. 234, 309-12, 368, 374)... Plaintiff also complains that she "hops" from one task to another without completing what she started (Pl.'s Br. at 11).  But her own psychiatrist seemed to disagree with this claim inasmuch as Dr. Clark concluded that Plaintiff had no difficulty with, for example, doing her ADL (Tr. 310).

(Def.'s Br. at 18-19.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity ("RFC") for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a) and 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the

Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In this case, the ALJ determined that Claimant was capable of "perform(ing) sedentary work." (Tr. at 21.) The ALJ stated:

> In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416 and SSRs 96-4p and 96-7p.  The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p and 96-6p.

(Tr. at 21.)

Claimant argues that the ALJ's RFC assessment did not comply with the requirements of Social Security Ruling ("SSR") 96-8p in that the ALJ did not consider the impact of her bipolar disorder on functional ability. (Pl.'s Br. at 10-11.)

The undersigned has carefully reviewed the ALJ's decision regarding his consideration of, or lack there of, Claimant's documented bipolar disorder. (Tr. at 368-75.) The undersigned

22

finds that while the ALJ found Claimant's "affective disorder" to be a severe impairment, the ALJ decision clearly indicates that major depression disorder was the affective disorder found to be the severe impairment, as only it is mentioned by the ALJ. (Tr. at 19.)  The ALJ found:

> Dr. David Clark, the claimant's treating psychiatrist, has treated the claimant since July 2003 for major depression following her first considered suicide attempt. She reported difficulty sleeping, irritability, crying spells, and being anxious. She responded well to CBT therapy and mood stabilization. She was prescribed Neurontin and Lexapro (Exhibits 9F, 15F)...

> The psychological reviewers at the initial and reconsideration determinations concluded that the claimant's mental health impairments are nonsevere. However, the more recent evidence of her treatment was not available to the reviewers at that time.  Treatment records indicated her mood had improved with treatment. In August 12, 2004, office visit, her mood showed "some anxiety" over thoughts of returning to work or volunteering. She has received outpatient treatment and her domains are within normal limits. She did not have any restrictions of activities of daily living; mild difficulties maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Exhibits 5F, 10F).

(Tr. at 20.)

The undersigned further notes that the ALJ admits in his decision that the psychological reviewers did not have "the more recent evidence of her treatment."  The undersigned notes that it is the more recent evidence that diagnoses Claimant with bipolar disorder. (Tr. at  368-75.) Therefore, the undersigned finds that contrary to the Commissioner's argument, it was not evident that

23

the ALJ considered Claimant's bipolar disorder when he assessed her RFC.   It is also clear that State agency medical sources completing Psychiatric Review Technique forms on November 4, 2004 and June 19, 2005, did not have the more recent evidence showing Claimant's treatment for bipolar disorder.   (Tr. at 245-59, 317-336.)

The undersigned finds that the ALJ's RFC assessment deviated from the "narrative discussion" requirements of SSR 96-8p.   Under these requirements,

> [t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).   In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule [FN7]), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.   The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p at 34478. Footnote 7 of SSR 96-8p states that "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." Id.   The ALJ's decision does not contain the requisite narrative discussion, including specific clinical and laboratory findings of record as well as Claimant's self-reported symptoms and daily activities.

24

Accordingly, the court finds that the ALJ's RFC assessment does not meet the requirements of SSR 96-8p and is not supported by substantial evidence of record.

New Medical Evidence

Claimant next argues that new medical evidence obtained since the hearing establishes by substantial evidence that Claimant is disabled. (Pl.'s Br. at 11-13.)  Specifically, Claimant argues that the

> hearing was held on March 28, 2006.  The MRI was
> performed on May 8, 2006.  The medical records from
> Health Right are certainly "new evidence."  Also, the May
> 8th MRI objectively shows a medical reason for some of
> the symptoms Ms. Adkins described at the hearing, which
> had not been discovered previously.  Thus, it is clear
> that the Health Right records are not cumulative.  The
> spur at C5-6 provides an explanation for the arm and back
> problems which Ms. Adkins has experienced for years.
> Therefore, this new medical evidence also relates to the
> period before the date of the ALJ's decision.

(Pl.'s Br. at 13.)

The Commissioner argues that the Appeals Counsel considered this evidence but properly found that it did not provide a basis for changing the ALJ's decision.  Specifically, the Commissioner argues that

> The AC properly considered this evidence under Fourth
> Circuit law.  The AC must consider evidence
> submitted with the request for review if the additional evidence
> is, in part, "new" and "material."  Wilkins, 953 F.2d, at
> 95-96.  The May 2006 MRI was neither "new" nor "material"
> evidence.  Evidence submitted to the AC is "new" if it is
> not "duplicative" or "cumulative."  Id. at 96.  Here, the
> evidence that was before the ALJ included a July 2004 CT
> scan (Tr. 239) and an October 2004 MRI (Tr. 386-87) of
> her cervical spines.  As with her May 2006 MRI (Tr. 407),

25

this evidence showed that Plaintiff had spondylosis at multiple levels with abnormalities at C5-C6, such as degenerative disc changes, end plate irregularity, osteophyte formation, and a disc bulge associated with the effacement of her subarachnoid space and cord flattening (Tr. 386). As such, the May 2006 MRI was not "new" because it provided merely "cumulative" information.

Evidence submitted to the AC is considered "material" if there is a "reasonable possibility" that it would have changed the outcome. Id., at 96... Plaintiff argues that her MRI constituted objective medical evidence that supported her testimony concerning her impairments (Pl.'s Br. at 13), but the ALJ already determined, in Plaintiff's favor, that she had a medically determinable impairment(s) that could reasonably be expected to produce the symptoms that she alleged (Tr. 21). Otherwise, Plaintiff submitted no medical findings that established a clinical correlation between her MRI and her subjective complaints (Tr. 406).

(Def.'s Br. at 16-18.)

The Appeals Council stated in its decision that it considered the new evidence in keeping with the applicable statutes, regulations and rulings in effect at the date of its action, but that there is no basis for changing the ALJ's decision. (Tr. at 5.) The Appeals Counsel expressly stated that it had reviewed the additional medical evidence dated May 5, 2006 and May 8, 2006 from West Virginia Health Right Inc. and CAMC, along with the transcript of the hearing dated March 28, 2006. (Tr. at 5, 8.)

Medical-Vocational Guidelines

The undersigned finds that the ALJ decision that Claimant is limited to a sedentary level of exertion is supported by substantial evidence. Claimant was born on September 16, 1956.

26

(Tr. at 69.)   As a result, at age fifty, on September 16, 2006, she met Rule 201.14 of the Medical-Vocational Guidelines because she was closely approaching advanced age, was a high school graduate or more without direct entry into skilled work, and had skills which were not transferable.   20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.14 (2006).   Per 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.00(g)(2006):

> Individuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work.   When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains. However, recently completed education which provides for direct entry into sedentary work will preclude such a finding.   For this age group, even a high school education or more (ordinarily completed in the remote past) would have little impact for effecting a vocational adjustment unless relevant work experience reflects use of such education.

The date of the ALJ's Decision is April 14, 2006.   (Tr. at 17-23.)   Claimant was approximately five months away from her fiftieth birthday on the date of the ALJ Decision.   Per 20 C.F.R. § 404.1563(b)(2006):

> We will not apply the age categories mechanically in a borderline situation.   If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

Conclusion

After a careful consideration of the evidence of record, the

court finds that the Commissioner's decision is not supported by substantial evidence. Based on the previous discussion of the ALJ's errors and based upon the Medical-Vocational Guidelines Rule 201.14, a finding of disabled is directed. The undersigned finds that Claimant meets the definition of "disabled" as of the date of the ALJ's Decision, April 14, 2006. Accordingly, by Judgment Order entered this day, this matter is REVERSED and REMANDED for award of benefits as of April 14, 2006 and for further administrative proceedings to determine the amount of past due benefits and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit this Memorandum Opinion to all counsel of record.

ENTER: September 28, 2009

Mary E. Stanley
United States Magistrate Judge

28